JS-6

*FILED*
CLERK, U.S. DISTRICT COURT

11/2/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CW___ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT CROSBY and KARISSA CROSBY, individually, and on behalf of their son JAKE CROSBY,<br><br>Plaintiffs,<br>v.<br><br>CALIFORNIA PHYSICIANS' SERVICE dba BLUE SHIELD OF CALIFORNIA, *et al.*,<br><br>Defendants. | Case No.: SACV 17-01970-CJC (JDEx)<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [Dkt. 88] AND DISMISSING CASE FOR LACK OF ARTICLE III STANDING |

## I. INTRODUCTION

In this putative class action, Plaintiffs Scott and Karissa Crosby allege that Defendants California Physicians' Service d.b.a. Blue Shield ("Blue Shield"), Magellan Health, Inc. ("Magellan"), and Human Affairs International of California ("HAI-C") systematically deny, reduce, or revise down insurance coverage for medically necessary Applied Behavior Analysis (ABA") therapy for children with Autism Spectrum Disorder ("ASD") in violation of the Employee Retirement Income Security Act ("ERISA"). (Dkt.

48 [Second Amended Complaint, hereinafter "SAC"].) Now before the Court is Plaintiffs' motion for class certification. (Dkt. 88 [Notice of Motion]; Dkt. 89-1 [Memorandum of Points and Authorities, hereinafter "Mot"].) For the following reasons, Plaintiffs' motion is **DENIED**. Because the Court concludes that Plaintiffs lack Article III standing, the case is **DISMISSED**.

## II. BACKGROUND

### A. ABA Therapy for Treating ASD

In 2009, when Plaintiffs' son Jake was 3 years old, he was diagnosed with ASD, "a complex developmental disability" affecting, among other things, verbal and nonverbal communication, educational performance, and overall functioning in society. (SAC ¶¶ 5, 10.) Plaintiffs allege that the most common, recognized, and effective method of treating ASD is ABA, which helps address three core areas of behavioral functioning: (1) self-care, like feeding, grooming, and repetitive motor mannerisms, (2) social adaptive skills, like sustaining conversations with others and developing peer relationships, and (3) safety concerns, including aggression toward self or others and dangerous behavior like eating nonfood items or running into the street. (Dkt. 136, Ex. T [Magellan's 2016 Medical Necessity Criteria Guidelines, hereinafter the "Guidelines"[1]] at HAI-CA_0023576–77; SAC ¶¶ 26, 27, 30.)

Jake is insured as a dependent beneficiary under his father Scott's insurance, a California Association of Professional Employees Benefit Trust plan (the "Plan") issued by Blue Shield. (SAC ¶ 5; Dkt. 138-3 Ex. J [Deposition of Scott Crosby, hereinafter "Scott Dep."] at 35.) The Plan provides mental health benefits for conditions including

---

[1] The Guidelines have been updated several times, but the portions Plaintiffs challenge are similar in each variation. (*See* Dkt. 136, Exs. S, U, V.)

autism, and covers mental health services that are "medically necessary." (SAC ¶¶ 48–50.) HAI-C, as Blue Shield's designated Mental Health Services Administrator, reviews ABA requests for medical necessity. (*Id.* ¶ 53; Dkt. 138-1 [Magellan and HAI-C Opposition, hereinafter "M. Opp."] at 3.) Magellan is HAI-C's parent company. (Dkt. 133 [Blue Shield Opposition, hereinafter "BS Opp."] at 1.)

### B. Plaintiffs' Experiences Obtaining Coverage for ABA Therapy

Jake has been receiving ABA therapy from Autism Spectrum Consultants ("ASC") for over a decade. (SAC ¶¶ 63–64; Scott Dep. at 34–35.) He has "responded well to" ABA therapy and "made significant progress since he started." (SAC ¶ 63.) For many years, Defendants approved all of the ABA hours Plaintiffs sought for Jake. In 2016, however, Plaintiffs asked Magellan to cover 150.5 hours per month of ABA therapy for October 2016 to April 2017, and Magellan approved only 120.4 hours. (*Id.* ¶ 68.) Plaintiffs appealed Magellan's decision to Blue Shield, and Blue Shield upheld the decision. (*Id.*) Plaintiffs then sought independent review from the California Department of Managed Health Care ("DMHC"). (*Id.* ¶ 70.) The DMHC reversed Defendants' decision, concluding that 150.5 hours per month of ABA was medically necessary for Jake. (*Id.*)

After the DMHC's decision, Plaintiffs made three additional requests for 150.5 hours of ABA therapy for Jake. Each time, Magellan approved only some portion of it. (*Id.* ¶¶ 72, 75, 76.) Each time, Blue Shield affirmed Magellan's decision. (*Id.* ¶¶ 73, 75.) And each time, the DMHC overturned the decisions, concluding that 150.5 hours of ABA therapy was medically necessary for Jake. (*Id.* ¶¶ 74–75.) Plaintiffs contend that "Defendants' complete disregard of the DMHC's repeated findings that Plaintiffs' requested ABA therapy was medically necessary" shows that Defendants have a

"systematic policy and practice to routinely and arbitrarily deny ABA therapy and to uphold these denials under a perfunctory review on appeal." (*Id.* ¶ 77.)

### C. Procedural History

Plaintiffs originally brought this case in state court, asserting claims for breach of the covenant of good faith and fair dealing, intentional interference with contractual relations, violations of California's Unfair Competition Law, and negligence. Defendants removed, and this Court concluded Plaintiffs' state law claims were preempted by ERISA. (Dkt. 25 at 10.) Plaintiffs' amended pleadings thereafter asserted that Defendants' conduct violates ERISA. (Dkt. 28 [First Amended Complaint]; SAC.) Specifically, Plaintiffs allege that Defendants breached their fiduciary obligations under ERISA by making decisions on the amount of medically necessary ABA therapy for a given child based on their own financial interests, not the best interests of the child. (SAC ¶¶ 105–14.) They contend that Defendants did this by considering impermissible criteria when deciding medical necessity: a child's age, the number of weekly ABA hours they previously received, and the duration of their ABA treatment. (*See id.* ¶ 57.)

Plaintiffs now seek to certify a class. In the SAC, they sought to certify a class of people "who sought and were denied coverage for all or a portion of [ABA] therapy for treatment of [ASD]." (*Id.* ¶ 89.) In their motion, Plaintiffs asked the Court to certify a different class—one including those who "made a request for continued coverage that was reduced or denied based upon the Magellan medical necessity criteria for Applied Behavior Analysis therapy." (Dkt. 90-1 at 15.) Defendants responded to Plaintiffs' motion based on that class definition. On the day they filed their reply, Plaintiffs filed an "amended notice of motion for class certification" stating that they now seek to certify the following class:

> All participants or beneficiaries in a Blue Shield health
> insurance plan governed by ERISA, which is fully underwritten

> by Blue Shield and administered by Magellan (a) who at any time since January 1, 2016 were deemed covered for Applied Behavioral Analysis therapy for treatment of autism spectrum disorder, (b) who Magellan red-flagged as part of its Care Shaping Program, and (c) since January 1, 2016 made a request for continued coverage that was revised down, reduced or denied based upon the Magellan medical necessity criteria for Applied Behavior Analysis therapy.

(Dkt. 151 at 1.) Recognizing that Defendants had not yet had an opportunity to address Plaintiffs' new class definition, the Court allowed Defendants to file a surreply. (Dkt. 166-1 [Surreply].) The Court also permitted Plaintiffs leave to respond to the surreply. (Dkt. 179 [Response to Surreply].)

### D. Defendants' Challenged Conduct

After these amendments, Plaintiffs seek to represent a class challenging Defendants' process for assessing medical necessity as deviating from generally accepted professional standards of care. Specifically, Plaintiffs contend that Defendants use Magellan's Guidelines and HAI-C's Care Shaping Program to consider impermissible factors—a child's age and the duration and amount of prior ABA therapy—in the medical necessity determination to decrease the amount of ABA therapy they cover. (Dkt. 153-1 [Plaintiffs' Combined Reply, hereinafter "Reply"] at 1–2, 4; *see* SAC ¶ 57 [alleging that the Guidelines "place arbitrary quantitative limits (e.g., hour and age limits) on ABA therapy"].)

To decide what amount of ABA therapy is medically necessary for a particular child, and therefore what amount to authorize, HAI-C's clinicians use a process it calls "care shaping." (*See* Dkt. 138-3 Ex. H [Declaration of Yagnesh Vadgama, Magellan's Vice President of Clinical Care Services, Autism, hereinafter "Vadgama Decl."] ¶ 5.) The Care Shaping Program is HAI-C's practice of working with providers to

cooperatively determine the amount of treatment that is medically necessary for a particular member. (BS Opp. at 7.) In the program, when an ABA provider submits to HAI-C a proposed treatment plan for a child with ASD, HAI-C and the provider discuss how many hours are medically necessary. (Vadgama Decl. ¶¶ 6–8.) If a HAI-C care manager believes a provider requested more hours than medically necessary, the manager initiates a "care shaping call" with the provider. (BS Opp. at 7.) If a provider agrees that the initial request was too high, the provider withdraws the initial request and submits a new request for a lower number of hours. (*Id.*)

To determine what amount of care is medically necessary, HAI-C care managers apply Magellan's ABA Guidelines. The Guidelines lay out a variety of factors to consider in determining what amount of care is appropriate. They delineate what criteria must be met to initiate care, what criteria must be met to continue care, and what criteria must be met to discharge from care. Plaintiffs specifically challenge the following definitions in the Guidelines' introductory section:

> ***Comprehensive Intervention***: Services may range from 21 to 40 hours per week, early in the recipient's development (for example, under the age of 7). Services are provided for multiple targets across most or all developmental domains. Comprehensive interventions may close the gap between a recipient's level of functioning and that of a typically developing peer. The standard of care for comprehensive services has been for durations of 1 to 2 years.
>
> ***Focused Intervention***: Services are provided up to 20 hours per week and are directed to a more limited set of problematic behaviors or skills deficits in areas such as self-care, communication and personal safety. Focused services introduce and strengthen more adaptive behaviors in order to address specific behaviors that are problematic for the recipient.

(SAC ¶ 57; Guidelines at HAI-CA_0023578.) According to Defendants, these definitions reflect the general expectation that many children will receive "comprehensive intervention"—i.e. many hours per week of ABA therapy—when they first begin, and then "focused intervention"—i.e. fewer hours per week of ABA therapy—as they begin to master skills and decrease maladaptive behaviors. (*See* Vadgama Decl. ¶ 31.) Based on these principles, as part of the Care Shaping Program, requests for ABA for children older than 6 years old, children receiving more than 25 hours a week of ABA, and children who have been receiving ABA for 2 or more years are "red-flagged" so that HAI-C clinicians will analyze the requests with additional scrutiny. (Reply at 1–2.) Plaintiffs contend that considering age and ABA use history deviates from generally accepted professional standards of care.

## IV. DISCUSSION

After twice changing their proposed class definition[2], Plaintiffs seek to certify a class challenging Defendants' alleged improper consideration of age and ABA therapy history in medical necessity determinations through the Guidelines and the Care Shaping Program. But even setting aside the procedural issues with the class Plaintiffs seek to represent, class certification is still inappropriate. First, Plaintiffs lack Article III standing to bring this case at all. Second, setting aside Plaintiffs' lack of standing,

---

[2] Plaintiffs' request that the Court certify a class not described in the SAC is procedurally improper. When a plaintiff desires to change the definition of the proposed class, the remedy is to seek leave from the court to amend the complaint, not to seek certification of a class different than the one described in the operative pleading. *Urena v. Earthgrains Distribution, LLC*, 2017 WL 4786106, at *3 n.1 (C.D. Cal. July 19, 2017) (explaining that the plaintiffs' motion was "procedurally improper" because the class definition in the motion was "materially different from the definition in the operative Complaint"). The reason for this is simple. It is not a court's job "to piece together [a plaintiff's] ongoing revisions to decipher the class" a plaintiff seeks to certify. *Coughlin v. Sears Holdings Corp.*, 2010 WL 4403089, *2 (C.D. Cal. Oct. 26, 2010). Nor is it a defendant's job to predict what additional groups of people might later be added to the class the plaintiff seeks to certify. Instead, it is a plaintiff's job to present the class sought to be certified in the operative pleading. *See id.*; *see also B.R. v. County of Orange*, 2017 WL 10525878, *3 (C.D. Cal. Dec. 11, 2017) ("It is Plaintiff's burden not this Court's, to propose a class that merits certification.").

Plaintiffs have failed to show how they meet the requirements of Federal Rule of Civil Procedure 23.

### A.  Article III Standing

Article III of the United States Constitution requires that courts adjudicate only actual cases or controversies. To constitute an actual case or controversy, the plaintiffs bringing a case must have standing. The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy the standing requirement, a plaintiff must show that (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the defendant's challenged actions, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000). Here, Plaintiffs cannot show that they have sustained a sufficiently concrete injury or that a favorable decision would redress their injury.

#### 1.  Injury-in-Fact

Defendants argue that Plaintiffs lack standing to pursue claims on Jake's behalf because they cannot show a sufficiently concrete injury.[3] (M. Opp. at 13–19; BS Opp. at 2.) The Court agrees. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), *as revised* (May 24, 2016). In other words, a plaintiff does not automatically satisfy "the injury-in-fact requirement whenever a statute grants a person a statutory right and

---

[3] Defendants also argued that Plaintiffs do not have standing to pursue claims on their own behalf. (M. Opp. at 12–13.) In response, Plaintiffs stated that they are no longer pursuing individual claims. (Reply at 18 n.6.)

purports to authorize that person to sue to vindicate that right." *Id.* Rather, a plaintiff must allege more than "a bare procedural violation, divorced from any concrete harm" to satisfy Article III. *Id.* The Supreme Court recently clarified that this is true for ERISA, like any other statute. *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020) ("There is no ERISA exception to Article III."). The injury-in-fact requirement is important because it ensures that the plaintiff has a "personal stake in the outcome" of the case. *O'Shea v. Littleton*, 414 U.S. 488, 493–94 (1974).

Plaintiffs do not have a sufficiently concrete injury to ensure that they have a personal stake in the outcome of this case. At bottom, the "injury" Plaintiffs suffered is that they had to appeal Defendants' decisions to get the treatment Jake needed because Defendants allegedly used improper considerations to decide the amount of coverage to provide. (*See* Reply at 20 [arguing that "regardless of whether *the DMHC* provided a fair adjudication of Plaintiffs' ABA authorization requests, *Defendants* never did"].) Plaintiffs' multiple administrative appeals to get Jake the ABA therapy he needed were surely a stressful and time-consuming hassle. But those appeals were also required to assert Plaintiffs' claims in federal court. (*See* SAC ¶ 60 [noting that the Plan requires claimants to exhaust administrative remedies before filing suit]); *Diaz v. United Agr. Employee Welfare Ben. Plan & Tr.*, 50 F.3d 1478, 1483 (9th Cir. 1995) (explaining that an ERISA "claimant must avail himself of a plan's own internal review procedures before bringing suit").

To have standing to assert claims against Defendants for violation of ERISA, and to have a sufficient stake in the outcome of this case, Plaintiffs must have been injured beyond their need to pursue administrative appeals. They were not. Plaintiffs received all of the ABA therapy they sought for Jake. *See Thole*, 140 S. Ct. at 1619 (finding important that the plaintiffs had "received all of their monthly benefit payments so far").

And the preliminary decision they received was based not on the criteria they challenge but on Jake's individual circumstances at the time they requested the therapy.

Plaintiffs argue that their injury-in-fact is "the denial of their rights to Guidelines that were developed for their benefit and to a fair adjudication of their claims using medical necessity criteria that follow generally accepted professional standards as required by the Blue Shield Group Plan." (Reply at 20.) But this alleged injury is not concrete and particularized in the context of this case. Rather, it is merely hypothetical. *Laidlaw*, 528 U.S. at 180–81. Even assuming the Guidelines encouraged improper medical necessity considerations, when Defendants decided not to approve all of the ABA hours Jake sought, they did so based on his own individual history and performance, not based on his age or ABA history. *See Ryan S v. UnitedHealth Grp., Inc.*, 2020 WL 103517, at *4 (C.D. Cal. Jan. 6, 2020) (granting motion to dismiss based on Article III standing because the plaintiff failed to connect any of the defendants' challenged coverage and claims-handling practices for mental health and substance abuse issues with his own treatment in a manner that stated a cognizable injury).

For this reason, the outcome of this case will not affect Plaintiffs' future benefits. *Thole*, 140 S. Ct. at 1619. Whether Plaintiffs win or lose this case, Defendants will make medical necessity decisions based on Jake's individual circumstances, as they have in the past. *See id.* Under these circumstances, that Defendants' guidelines allegedly improperly mention age and ABA use history as medical necessity considerations is the sort of "bare procedural violation, divorced from any concrete harm" that is insufficient to establish Article III standing. *Spokeo*, 136 S. Ct. at 1549. Simply stated, Plaintiffs have no concrete stake in this lawsuit and lack standing to bring it. *See Thole*, 140 S. Ct. at 1619.

### 2. Redressability

Similarly, Plaintiffs cannot show that it is likely, as opposed to merely speculative, that their alleged injury will be redressed by a favorable decision. *See Laidlaw*, 528 U.S. at 180–81. Plaintiffs ask that the Court require Defendants to (1) change their guidelines and (2) reprocess claims with acceptable guidelines. (Mot. at 11.) The latter form of relief will certainly not redress any injury Plaintiffs have—Plaintiffs already got all the ABA therapy they sought for Jake. Reprocessing Jake's claims will do nothing more for him.

Nor will changing the Guidelines redress any injury Plaintiffs sustained. There is no reason to believe that requiring Defendants to change their guidelines or the terms of the Care Shaping Program to remove references to age and ABA use history would change any future medical necessity decisions Defendants make for Jake. Jake's past experience shows this. When Defendants decided not to approve all of the ABA hours Jake sought, they did not do so based on his age or ABA use history. Rather, they did so based on considerations specific to Jake's progress. Their reasons included that "Jake was exhibiting 'too low of a frequency of maladaptive behaviors compared to the high level of service requested,'" that Jake's "behavioral excesses [did] not represent significant threat of harm to [him] or others," that Jake's "gains made towards development norms and behavioral goals can be maintained if care is reduced," and that the information from ASC did "not show that [Jake's] current behaviors or symptoms significantly interfere with home or community activities." (Vadgama Decl. ¶¶ 13, 17, 26.) Accordingly, even if the Court ordered Defendants to remove any consideration of a member's age or previous ABA therapy from the Guidelines or the Care Shaping Program, the alleged harm Plaintiffs suffered could still occur again in the future. It is

therefore speculative at best that the harms Plaintiffs allege would be redressed by the relief they seek. *See Laidlaw*, 528 U.S. at 180–81.[4]

In sum, Plaintiffs lack standing to pursue their claims on behalf of themselves or on behalf of a class. *See O'Shea*, 414 U.S. at 493. They have not shown any injury beyond their obligation to pursue administrative appeals, nor have they shown that any injury that they may have suffered can be redressed by a favorable decision.

### B.   Rule 23(a) Requirements

Even putting aside their lack of standing to bring their own claims and those of the class, Plaintiffs have not shown that their proposed class can satisfy the requirements of Rule 23(a). Under Rule 23(a), a class may be certified if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Rule 23 is not merely a pleading standard—a party seeking class certification must affirmatively demonstrate compliance with the Rule by proving the requirements in fact. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

#### 1.   Numerosity

---

[4] Further complicating redressability in this case is the involvement of the ABA provider in the Care Shaping Program—a collaborative process between HAI-C and those providers in which the providers sometimes decide to voluntarily resubmit requests for fewer ABA hours than originally requested. There is no way to know why providers decide to resubmit the hours requested. Given the providers' role, granting the relief Plaintiffs seek would not likely redress the harms Plaintiffs allege. *See Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (explaining that "[t]here is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict").

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." There is no magic number required to satisfy numerosity; instead, courts consider the facts of each specific case. *See In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *Gen. Tel. Co. of Nw., Inc. v. E.E.O.C.*, 446 U.S. 318, 330 (1980)). As a general matter, however, courts have found that "classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1095 (C.D. Cal. 2015); *see Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602–03 (C.D. Cal. 2015).

To support their contentions regarding numerosity, Plaintiffs rely on data showing the average number of monthly users of ABA and the total number of people who were "Care Shaped." (Mot. at 16; *see* Dkt. 90-2 [Declaration of Andrew S. Friedman] Ex. 27; Dkt. 153-2, Ex. 52.) Plaintiffs do not present data showing how many ABA users had their hours "revised down, reduced or denied based upon the Magellan medical necessity criteria," as required to be part of the class. The Court is left to speculate and to have to assume that of the hundreds of ABA users, more than 40 were red-flagged as part of the Care Shaping Program and had their hours revised down, reduced, or denied based on the Guidelines. The Court is not comfortable engaging in such speculation and making such an assumption. *See Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties.").

### 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To satisfy this requirement, Plaintiffs must "demonstrate that the class members

'have suffered the same injury." *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). This does not "mean merely that they have all suffered a violation of the same provision of law," but rather that the plaintiffs' claim depends on a "common contention" that is capable of classwide resolution. *Id*. This means "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs have failed to make a sufficient showing that the class members have suffered the same injury or that there are questions of law or fact common to the class. "The commonality element may be fulfilled if the court can determine 'in one stroke' whether a single policy or practice which the proposed class members are all subject to 'expose them to a substantial risk of harm.'" *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)). Class certification is only appropriate where the policy or practice "is unlawful as to every [proposed member] or it is not." *Id.*

The policy or practice Plaintiffs challenge here is Defendants' consideration of age and ABA history in medical necessity determinations. Plaintiffs submit that common questions include, for example, "Are the ABA Therapy Criteria consistent with generally accepted professional standards?" and "Did Defendants engage in systemic Care Shaping and, if so, did Defendants' Care Shaping actions violate their ERISA fiduciary duties?" (Mot. at 18.) But the court cannot determine "in one stroke" whether Defendants' alleged policy was lawful or unlawful as to every class member. That is because the claims process Plaintiffs challenge involves highly individualized determinations about a member's behavior and circumstances at the time of each request. (*See* BS Opp. at 1.) In other words, Defendants' allegedly wrongful considerations are not hard-and-fast rules that determine outcomes when applied. (*See* Dkt. 135 Ex. E [Declaration of Michael Millman, Ph.D., Blue Shield's Clinical Director of Behavioral Health] ¶ 5 [explaining that the definitions section of the Guidelines are not "operative criteria that are applied to

determine whether to authorize or deny requested ABA services"].) Rather, Defendants make decisions on how much ABA therapy is medically necessary together with each child's ABA provider based on each individual child's needs at the time of the request. (*See id.* ¶ 9); *Willis*, 943 F.3d at 885 (9th Cir. 2019) (finding no commonality where there was no "specific practice that applie[d] uniformly to all class members," but rather "each sweep [was] different"). Contrary to Plaintiffs' assertions, Defendants do not have any uniform policy or practice to deny, reduce, or revise down based on the Guidelines or the challenged criteria of age or ABA use history. (*See* Reply at 6 [referring to Defendants' practices as "a uniform set of faulty guidelines"].)

Put another way, Plaintiffs do not allege that the Guidelines, Care Shaping Program, or the challenged criteria of age and ABA use history are strict bright-line rules that require a particular result in any given situation. Not every six-year-old with ASD is treated the same under the Guidelines. (*See* Guidelines at HAI-CA_0023636 [indicating that comprehensive services are "*generally* . . . restricted to younger children"] [emphasis added].) Not every child who has received more than 2 years of ABA therapy is treated the same under the Guidelines. Rather, a child's age and ABA use history are only factors that HAI-C and ABA providers consider in the context of the child's individual circumstances and progress. (*See* Vadgama Decl. ¶ 9 [explaining that the statements in the Guidelines that Plaintiffs challenge "make it clear there is no[t] a strict age limitation or cut-off on the delivery of such treatment"].) The Guidelines do not permit Defendants to automatically deny or reduce treatment hours based on a member's age or ABA history. (Vadgama Decl. ¶¶ 10–11.) Every child is different.

Further complicating commonality in this case is the nature of the Care Shaping Program Plaintiffs challenge. Under that program, the decision whether to revise down is up to the individual ABA provider. In deciding whether to revise down, that provider might consider the Guidelines criteria, but the provider will also consider its clinical

analysis based on the unique and specific circumstances of the individual child at the time of the request. Plaintiffs have not shown that there is any specific, uniform, and applied policy and practice that providers use to revise down.

Plaintiffs' experience with Jake shows how the individual circumstances of each child and the involvement of ABA providers precludes a finding of commonality here. Jake is over 6 years old. He has received comprehensive ABA therapy for over a decade. He was red-flagged under the Care Shaping Program. Nevertheless, ASC did not revise down the number of ABA hours requested for Jake. (Dkt. 138-3 Ex. P [Deposition of Cynthia Underwood of Autism Spectrum Consultants, Inc.] at 32–33.) Rather, ASC decided how many ABA hours to request based on Jake's particular needs at that particular time. Moreover, Defendants' decision to authorize fewer ABA hours than requested was based not on Jake's age or ABA history, but rather on his individual circumstances at the time of his requests—that his maladaptive behaviors were infrequent, that his behavioral excesses were not a significant safety concern, and that the significant gains he had made could be maintained even if care were reduced. (Vadgama Decl. ¶¶ 13, 17, 26.)

Simply put, there is no common contention in this case that determination of its truth or falsity will resolve "an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350; *Willis*, 943 F.3d at 885–86 (9th Cir. 2019) (affirming denial of class certification where the plaintiffs failed to identify a unified "specific practice that applies uniformly to all proposed class members").

### 3. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Representative claims are "typical" if they

are "reasonably coextensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Typicality aims to ensure that "the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Plaintiffs are not typical of the class they seek to represent. The proposed class includes those who "Magellan red-flagged as part of its Care Shaping Program, and . . . made a request for continued coverage that was revised down, reduced or denied based upon the Magellan medical necessity criteria for Applied Behavior Analysis therapy." (Dkt. 151 at 1.) That did not happen to Jake. Although Jake was red-flagged as part of the Care Shaping Program, ASC did not revise down the ABA hours it requested for Jake. Additionally, when Defendants initially decided not to cover all of the hours requested for Jake, they did so not based on the Guidelines or his age or ABA use history, but rather based on Jake's own individual circumstances and progress. (*See* Vadgama Decl. ¶¶ 13, 17, 26.) In the end, Jake received all of the ABA hours that ASC recommended without any delay or therapy interruption. (*See* M. Opp. at 10.) All of his ABA hours were covered. (*See id.*) Indeed, Jake did not even use all of the hours Defendants covered. (Vadgama Decl. ¶¶ 23, 30, 31.)

In contrast, the class members will have had coverage that was revised down, reduced, or denied. It is possible that decisions on their coverage may have been made based on the allegedly wrongful criteria. And decisions on their coverage will be based on their own individual circumstances. Plaintiffs are not typical of such a class.

### 4. Adequacy

Plaintiffs must also show that they will "will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation requires that

the Plaintiffs (1) have no interests antagonistic to the interests of the class and (2) are represented by counsel that is capable of vigorously prosecuting their interests. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 618 (N.D. Cal. 2015); *Staton*, 327 F.3d at 957.

Plaintiffs clearly are not adequate representatives of the class that they seek to represent. The proposed class would include people who did not receive all the ABA hours they sought. And it could include people whose hours were revised down based on the Guidelines. Plaintiffs' interests would not sufficiently align with those class members' interests. They received all the ABA therapy they sought for Jake. Consequently, Plaintiffs have no incentive to pursue this case as vigorously as class members who did not receive all of the ABA hours they requested.

### C. Rule 23(b) Requirements

In addition to demonstrating that the Rule 23(a) requirements are satisfied, Plaintiffs must also establish one or more of the grounds for maintaining a class action under Rule 23(b). Plaintiffs contend that there are two grounds here for maintaining a class action under Rule 23(b): 23(b)(1) and 23(b)(2). The Court concludes otherwise.

#### 1. Rule 23(b)(1)

Rule 23(b)(1)(A) allows certification "if prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Rule 23(b)(1)(B) allows certification "if prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter,

would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."

This case does not fit either of these categories. Prosecuting separate actions would not create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. That is because each decision on the amount of medically necessary ABA therapy is individually tailored to the child's unique circumstances and individual needs at the time the request is made. Similarly, the adjudication for one class member would have no dispositive impact on any other class member's claim. In short, individual adjudications would not be "impossible or unworkable," and instead are possible and preferable given the nature of Defendants' claims process, the Guidelines, and the Care Shaping Program. *Dukes*, 564 U.S. at 361 (describing the characteristics of a 23(b)(1) class). Any inconsistent or varying adjudications with respect to individual class members would reflect nothing more than the individual needs and circumstances of those children.

### 2. Rule 23(b)(2)

Nor does this case fit Rule 23(b)(2). That rule allows certification "if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs have not shown that Defendants acted or refused to act on grounds that apply to the whole class. Again, HAI-C (sometimes together with a child's ABA provider) decides whether to revise down ABA hours based on each child's unique circumstances at the time the request is made.

There is no policy or practice Defendants have that causes ABA therapy to automatically be revised down based on particular criteria in the Guidelines.[5]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is **DENIED**. Since the Court determines that Plaintiffs lack Article III standing, the case is **DISMISSED.**

DATED: November 2, 2020

HON. CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[5] Jake himself is the best proof of this. ASC refused to revise down the ABA hours it requested on his behalf. When Defendants stated that they intended not to cover all of the hours requested, they did so based on Jake's individual circumstances, not on the age and ABA history criteria Plaintiffs challenge.